UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MARTA DECKER,

                     Plaintiff,

      -against-

MARIST COLLEGE,

                     Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Case No.:
ECF Case

**COMPLAINT
AND JURY DEMAND**

'11 CIV 3389
Briccetti

Plaintiff, **MARTA DECKER,** by her attorneys, **SAPIR & FRUMKIN LLP,** as and for

her Complaint against Defendant, **MARIST COLLEGE,** alleges as follows:

## I. NATURE OF CLAIMS

      1.     This action is based on violations of Title VII of the Civil Rights Act of 1964 ("Title

VII"), 42 U.S.C. §§ 2000e-2 and 2000e-3 *et seq.*, as amended by the Civil Rights Act of 1991 for

damages caused by Defendant, **MARIST COLLEGE** ("Marist" or "college"), for gender

discrimination, sexual harassment, hostile work environment, and discriminatory and retaliatory

discharge.  Plaintiff seeks declaratory relief, reinstatement, back pay, front pay, and damages

resulting from Defendant's unlawful and discriminatory conduct.

## II. JURISDICTION & VENUE

      2.     Jurisdiction of this Court to adjudicate Plaintiff's claims exists pursuant to 28 U.S.C.

§ 1331 and 42 U.S.C. §§ 2000e-5(f)(3) because they arise under Title VII.

      3.     Venue is proper with this Court pursuant to 28 U.S.C. § 1391 and 42 U.S.C. §

2000e-5(f)(3) because the Southern District of New York is the district in which Plaintiff resides,

Defendant Marist maintains its place of business, and the discriminatory acts occurred.

4.     Plaintiff has fully complied with the administrative prerequisites for commencement of this action. On or about February 5, 2009, Ms. Decker filed a Charge of Discrimination with the Equal Employment Opportunity Commission alleging employment discrimination. This Complaint has been filed within 90 days of notification of the right to sue.

### III. PARTIES

5.     At all times mentioned herein, Plaintiff has been a resident of the County of Dutchess, and State of New York.

6.     Plaintiff is protected by Title VII as provided by 42 U.S.C. §§ 2000e in that she was an employee of the Defendant Marist, which has more than fifteen (15) employees.

7.     Upon information and belief, Defendant Marist is an undergraduate and graduate educational institution, offering course-work and degrees in the arts, sciences, education, management, and social work.

8.     Upon information and belief, at all times relevant to this action, Defendant Marist has been providing educational services and continues to provide educational services on a regular basis within the State of New York, so as to give this Court personal jurisdiction of Defendant Marist. Defendant Marist maintains its principal place of business office at 3399 North Road, Poughkeepsie, New York 12601. Plaintiff performed services on behalf of and in furtherance of Defendant Marist's business on a regular basis within the State of New York.

9.     Defendant is a covered "employer" under Title VII, 42 U.S.C. § 2000e.

### IV.  FACTS UNDERLYING PLAINTIFF'S CLAIMS

10.     Plaintiff, Marta Decker, was hired in February 2005 by Marist College and began her employment with the college as the Assistant Vice President for College Advancement.

11.     As the Assistant Vice President for College Advancement, Ms. Decker reported directly to Robert West, the Vice President for College Advancement.

12.     Ms. Decker's role as the Assistant Vice President for College Advancement entailed oversight of the college's annual fund, corporate, state and federal grant proposals, development operations, overseeing the administrative staff, and building volunteer and donor relationships. In addition, she secured donations, gifts, and contributions for the college. Within that role, Robert West was her direct supervisor, which involved them working together frequently to accomplish the college's fund-raising goals.

13.     On or around 2007, on account of Ms. Decker's excellent management and organization skills, Robert West expanded her duties to include responsibility for alumni relations oversight, donor relations, and duties as the Campaign Manager for the college's first capital campaign.

14.     Ms. Decker's performance was reviewed by Robert West in 2005, 2006, and 2007. She received positive performance reviews each year.

15.     Commencing on or around mid 2007, Robert West shared with Ms. Decker that he and his wife were experiencing marital difficulties, including sexual tension and that he suspected she was having an affair, and they were likely headed for divorce.

16.     On numerous occasions, Robert West began to share intimate personal details about his sex life with his wife, with Ms. Decker.

17.     Robert West also began to regularly comment on various women on the campus with an emphasis on their looks or body type.

2

18.     Robert West made inappropriate comments about his sexual life, sexual fantasies, and the sexual conquests of various colleagues at Marist and the Board of Trustees to Ms. Decker.

19.     For example, Robert West would share stories about his sexual relationships with former girlfriends with Ms. Decker.

20.     Robert West also would tell Ms. Decker which members of the Board of Trustees he found attractive, who was engaging in sexual relationships, or who was known for their sexual prowess.

21.     Similarly, Robert West spoke to Ms. Decker about other employees of Marist College who were engaged in inappropriate sexual relationships with co-workers.  On several occasions, Robert West confided in Ms. Decker that Sean Kaylor ("Mr. Kaylor"), the Vice President for Enrollment/Admissions was engaged in a extramarital affair with one of his subordinates.  Robert West also revealed that Mr. Kaylor had at least one inappropriate liaison with a student when he served in the college's Office of Admission before he was promoted to his current executive-level position in Enrollment/Admissions.

22.     The sexually charged environment grew progressively worse over the course of 2007 and into early 2008.  Over time, it became difficult for Ms. Decker to have a conversation with Robert West, without having the discussion turn to sex or the physical desirability of co-workers, trustees, or donors.

23.     In late 2007 and early 2008, Robert West began to comment on Ms. Decker physical looks insinuating that he and other males found her attractive.

24.     For example, Robert West took pleasure in sharing with Ms. Decker which members of the college's Board of Trustees and other high-level donors were sexually attracted to her and

3

wanted to initiate a sexual relationship with her.

25.     This was particularly offensive to Ms. Decker because her role as the Assistant Vice President of College Advancement & Campaign Manager dictated that she often work hand-in-hand with the Board and key donors at fund-raising initiatives, events, and campaign business.

26.     Robert West also insinuated that Ms. Decker was successful at her job with Board members and other donors because they simply found her attractive. These types of comments from Robert West made her feel uncomfortable and dirty.

27.     Robert West even regularly commented to Ms. Decker that he wanted to only hire females in the department who were attractive. Robert West often told her point-blank that he was only willing to hire a particular female candidate because of her looks and that he was proud of the fact that others said he had the "best looking" department on campus. Whether male candidates were attractive or not did not matter to Robert West when making hiring decisions.

28.     Robert West also commented on Ms. Decker's blonde hair regularly, made "dumb-blonde" jokes in front of her, and commented on how she smelled.

29.     On or about August 2007 on account of her positive work performance, Ms. Decker was provided with a new, more prestigious title, that of Assistant Vice President & Campaign Manager.

30.     After months of suffering through the sexually charged and gender discriminatory environment perpetrated by Robert West, Ms. Decker approached Dennis Murray, the President of the College (who was Robert West's supervisor) for assistance on how to handle the matter.

31.     On April 21, 2008, Ms. Decker sent Dennis Murray's assistant an electronic mail message ("e-mail") indicating that she needed to speak with him urgently.

4

32.     Dennis Murray met with Ms. Decker on that same day. During their meeting, which ran approximately two hours, Ms. Decker informed Dennis Murray of Robert West's sexually harassing behavior, discriminatory comments, and notified him the conduct was becoming more egregious overtime.

33.     Dennis Murray assured Ms. Decker that he would look into the matter and notify Marist's Human Resources ("HR") Department. Dennis Murray indicated that HR would be in contact with her shortly and that the matter would be kept confidential until she met with HR.

34.     On the same day, shortly after their two-hour meeting, Dennis Murray contacted Ms. Decker by telephone and informed her that not only would she be meeting with HR to discuss her sexual harassment and discrimination allegations, but the college's attorney would also be present for the meeting. In response, Ms. Decker asked if she should bring a legal representative with her, but she was flatly denied the right to do so by Marist because it would be "inappropriate" since an internal investigation was taking place.

35.     Ms. Decker was also contacted by the HR representative assigned to handle the matter on that day. The matter had been assigned to Michael Richardson ("Mr. Richardson"), a personal friend of Robert West. When Ms. Decker spoke with Mr. Richardson about scheduling an interview, she stressed the need to keep her complaint confidential until they had an opportunity to meet. Mr. Richardson assured her that the matter would only be discussed with those on a need-to-know basis.

36.     Within twenty-fours of reporting Robert West's sexual harassing conduct to Dennis Murray, Mr. Richardson unilaterally, and without first discussing the allegations with Ms. Decker, contacted Robert West about Ms. Decker's complaint. The information Mr. Richardson shared with Robert West was solely based on second-hand knowledge from Dennis Murray. Mr. Richardson

until this point had not had one substantive conversation with Ms. Decker about her concerns.

37.     Ms. Decker later learned that Mr. Richardson had arranged a casual meeting with Robert West on April 22, 2008, to discuss Ms. Decker's allegations. The meeting took place off-campus, over drinks at an inn in Rhinebeck, New York.

38.     Upon learning that Mr. Richardson had met with Robert West without even discussing the complaint with her, Ms. Decker sent Mr. Richardson an e-mail message questioning whether she should be concerned about his decision to meet with Robert West first. Mr. Richardson curtly replied that she should not be concerned.

39.     On or around April 24, 2008, Mr. Richardson met with Ms. Decker for the first time to discuss her sexual harassment, discrimination, and hostile work environment claims. During this meeting, Mr. Richardson admitted that he had already interviewed Robert West, off-campus at an inn in Rhinebeck.

40.     The college completed its superficial investigation on or around two weeks after Ms. Decker first reported Robert West's conduct to Dennis Murray.

41.     Ms. Decker on or around April 24, 2008, learned that the college's first interview of Robert West was over drinks in Rhinebeck. Moreover, only two of the seventeen employees in her department were interviewed. The two employees that the college interviewed were comprised of (1) Robert West's newly hired secretary who only began working for the department three months earlier in February 2008, and (2) the Executive Director of Alumni Relations, who had spent the majority of 2007 out on maternity leave. This was shocking to Ms. Decker because during her discussion with Dennis Murray and in her interview with Mr. Richardson, Ms. Decker had identified various employees who were witnesses to much of Robert West's inappropriate conduct, however,

6

the school failed to even interview one of these individuals. Rather the college interviewed a newly hired employee and another employee who had been out of the office for the majority of the time the conduct had taken place.

42.     Within a month of reporting the harassment to Robert West, and even though she had just been promoted to Assistant Vice President & Campaign Manager, in August 2007, the college demoted Ms. Decker. Her title was summarily changed back to Assistant Vice President for College Advancement. Ms. Decker's newly appointed duties as Campaign Manager were formally removed from her as well as many of her personnel and oversight responsibilities. Ms. Decker was unilaterally removed by the college from the Women's Mentoring Steering Committee, a group she helped form.

43.     On or around June 2008, Ms. Decker was provided with a new job description for her new position. Ms. Decker discovered that she was being asked to meet fund-raising goals that were not consistent with industry standards. For example, it is traditionally acknowledged in the fund-raising world that procuring a donation often requires multiple visits with a donor, on average between five and seven visits, to develop a rapport or relationship. The metrics provided by the college demanded that each visit Ms. Decker made with a donor should result in a donation, and completely ignored that this was not acknowledged industry practice. This requirement had never been previously asked of her.

44.     It became apparent to Ms. Decker that the college intended to set performance markers that would be impossible for her to meet.

45.     On or around August 8, 2008, after months of going back and forth over impossible performance markers, Ms. Decker, through her attorney, reported the sexual harassment, gender

7

discrimination, hostile work environment based on sex, and retaliation to directly the Board of Trustees by letter.

46.      Within a few days, on or around August 17, 2008, Ms. Decker received the first negative performance review of her tenure with Marist.  Despite previously receiving positive reviews from Robert West, she received a negative review in August 2008, only four months after she reported his harassing and discriminatory conduct to Marist in April 2008, and only days after reporting the continuing conduct to the Board of Trustees.  The surreptitious timing is further underscored by the fact that Ms. Decker had repeatedly requested to receive her performance review for months – as everyone else in her department had been reviewed in April and May 2008.

47.      During her review in August 2008, Ms. Decker was informed that she had not met the school's "public" donation goal, despite meeting the "cash-flow" donation goal being met. Historically, in terms of fund-raising efforts, the "cash-flow" goal was considered the most important marker, since this indicates how much money had been donated and deposited in the school's account.  The "public" goals simply reflected telephone and paper pledges to donate, but did not amount to actual checks written out to the school.  Ms. Decker and her team, in previous years, had not met the "public" goals, but this did not keep her from receiving positive performance reviews, as well as positive acknowledgment's from Dennis Murray's office and annual performance bonuses.

48.      Upon information and belief, no other member of the Annual Fund Advancement Senior teams had received a negative review that year, nor were they cited as not "making goal."

49.      In January 2009, Ms. Decker was transferred to the Office of Graduate and Adult Enrollment, which was managed by Mr. Kaylor.  Ms. Decker had previously identified this office as the singular office at the college that would be objectionable to be transferred to because Mr. West

had previously reported to her that Mr. Kaylor engaged in extramarital affairs with subordinates and even students.

50.     Ms. Decker believed that Marist was placing additional pressure on her to leave her position by mandating that she work closely with Mr. Kaylor, a known "playboy" at the school.

51.     In fact, upon learning of Ms. Decker's transfer, Mr. Kaylor informed her assistant Laurie Zurowski ("Ms. Zurowski"), not to get too friendly with Ms. Decker, because she "wouldn't be there for too long."

52.     After being transferred to Mr. Kaylor's department, Ms. Decker suffered through multiple demotions in title and multiple changes to her job description. As a result, Ms. Decker had diminished responsibilities in her position and now only managed a staff of one, as opposed to an office of seventeen individuals she managed prior to making her complaint to Dennis Murray in April 2008.

54.     On or around February 5, 2009, Ms. Decker filed a charge of discrimination, harassment, and retaliation with the Equal Employment Opportunity Commission ("EEOC").

55.     Ms. Decker was again reviewed in May 2009, by Mr. Kaylor. Although Mr. Kaylor provided her with a mediocre review, he was unable to identify specific examples of deficiencies and solely commented that she was "too aggressive" with her colleagues, which was untrue.

56.     Between July 31, 2009 through mid January 2010, Ms. Decker was placed on sick leave by her doctor(s) through the college's short-term disability plan ("STD"). Ms. Decker was forced to take STD leave due to the declining condition of her health, which included major depressive disorder, anxiety, alopecia, and headaches. These side-effects were a result of her stress caused by the harassment, discrimination, continuing hostile work environment and retaliation.

57.     When Ms. Decker returned to work in mid-January 2010, Ms. Decker learned that she was going to be transferred from the main campus to a satellite office in Fishkill, New York. The satellite office only had eight employees and was a far-cry from the bustling environment of the main campus. Moreover, no one from Ms. Decker's department was situated at the Fishkill satellite office, so she was totally isolated from her colleagues.  Ms. Decker also learned that the move carried a change in duties.  She would be responsible for less of the department's outreach efforts (her strength and prior experience) and more of the marketing research functions.

58.     In March 2010, Ms. Decker was formally moved to the satellite office.

59.     In April 2010, Ms. Decker learned she would be meeting with HR to discuss an alleged employee complaint that had been brought against her.  No details regarding the alleged complaint were provided to her at this time.

60.     A few days later, she learned that two HR representatives would be present in the meeting.

61.     On or around April 14, 2010, Ms. Decker met with HR representatives Michael Silvestro ("Mr. Silvestro"),the new HR Assistant Vice President,  and Jenna Rosenberg ("Ms. Rosenberg"). Out of concern that she was once again being set-up by HR, Ms. Decker used a tape recorder to record the meeting.  During the meeting, she was informed that her assistant, Ms. Zurowski, had made a complaint against her nine months earlier.  This was the first time HR had approached Ms. Decker about the complaint.

62.     On or around July 14, 2009, Ms. Decker had spoken to Ms. Zurowski, after learning that Ms. Zurowski had allegedly reported her to HR, after being called into a meeting by HR.  Ms. Decker spoke with Ms. Zurowski in her office, for about five minutes.  The conversation was brief

10

and was conducted in a professional and courteous manner.

63.     HR informed Ms. Decker that Ms. Zurowski claimed that she made an intimidating comment to her.  No other details were provided.

64.     Ms. Decker admitted to speaking to Ms. Zurowski but flatly denied making any intimidating comments to any employees.  Ms. Decker during the meeting represented herself in a professional and courteous manner.

65.     Within the next week in May 2010, Ms. Decker received several notes from Executive Vice President  Ray Merolli ("Mr. Merolli"), which stated that her behavior at the April 14, 2010 meeting was unprofessional and disturbing.  He clarified several times that Mr. Silvestro and Ms. Rosenberg had provided this information.  Ms. Decker similarly received a follow-up note from Mr. Silvestro, which also noted that in his twenty-fours years in HR, he had never observed such unprofessional behavior.

66.     On or around May 24, 2010, Ms. Decker wrote to Dennis Murray for assistance and revealed that she had tape recorded the April 14, 2010 meeting.

67.     On or around May 27, 2010, Ms. Decker, through counsel indicated to the EEOC that a second amended charge would be filed in June 2010.  However, the charge was not later amended as previously indicated by her attorney.

68.     On or around June 14, 2010, Ms. Decker was informed that while her tape recording of the meeting was legal, her actions were considered a violation of the school code of ethics and was instructed not to tape any other conversations.  Ms. Decker followed the directive.

69.     During this time, Ms. Decker spent the majority of her time focusing on marketing research efforts.  Also during this time, Ms. Decker applied for, and was granted admission to

11

Marist's Graduate Program in Communications, with the approval of the department. The program was set to begin in September 2010.

70.     To prepare for her admission to the Graduate Program, Ms. Decker registered for her courses and purchased supplies and textbooks. Pursuant to her employee benefits, the tuition for her graduate degree would be fully paid for by Marist.

71.     In August 2010, Ms. Decker learned that her division of duties had been changed again. Her latest responsibilities would now focus heavily on outreach efforts, and minimize the research efforts she had previously been responsible for.  Ms. Decker also learned from her supervisor Mr. Kaylor that her new position required frequent travel and that she should be on the road three days a week.

72.     In light of her new job responsibilities and travel requirements, Ms. Decker informed the Graduate school that she would need to defer her enrollment temporarily.

73.     On September 17, 2010, Ms. Decker was called into a meeting with Mr. Merolli and Mr. Silvestro.  They informed her that she was being terminated for violating the school's code of ethics by recording the conversation with HR on April 14, 2010, five months before.

74.     Ms. Decker was shocked to learn that the audio recording and alleged insubordination were the stated reasons for her termination because since the school had requested that Ms. Decker never record a conversation again on school grounds, she had complied with their request. Now, five months later, in September 2010, she was being terminated for violating the school's policies, even though  she did not record any more conversations after she was told to stop.

75.     Upon information and belief, the college ultimately terminated Ms. Decker because she complained of Robert West's sexually harassing and gender discriminatory behavior.

12

76.     Defendant's unlawful discrimination against Plaintiff based upon her gender and sexually harassing conduct constituted a continuing violation of Title VII.

77.     In addition, one of the benefits associated with Ms. Decker's employment at Marist, is that her immediate family receives free tuition at Marist's undergraduate and undergraduate schools.

78.     On or around January 2011, Plaintiff was informed that her daughter, a student in her last semester at Marist College, was going to be dropped from the program due to an alleged non-payment of her Spring 2011 tuition.  Even though Plaintiff provided Marist with payment in full for Spring 2011, and Marist cashed Ms. Decker's check and wrongly applied it to the Fall 2010 tuition bill, the college continued to threaten to drop Plaintiff's daughter from their undergraduate program.

## V.   AS AND FOR A FIRST CAUSE OF ACTION
### *Discrimination in Violation of Title VII*
### *(Hostile Work Environment)*

79.     Plaintiff repeats and re-alleges each allegation contained in paragraphs 1 through 78, as if fully set forth herein.

80.     Defendant condoned an unwelcome, sexually hostile sexually charged work environment based upon Ms. Decker's gender which resulted in a hostile work environment.

81.     Defendant's failure to properly investigate Ms. Decker's sexual harassment and gender discrimination claims further created a hostile work environment based on sex.

82.     Defendant employer Marist is liable for the acts and omissions of Robert West and Dennis Murray.

83.     By adversely affecting the terms, conditions and privileges of Plaintiff's employment because of her gender, Defendant violated Title VII.

13

84.     As a direct and proximate result of said acts, Plaintiff has suffered and continues to suffer damages, including, but not limited to, lost salary and benefits and interest thereon, pain and suffering, humiliation, mental anguish, emotional distress and loss of enjoyment of life.

## AS AND FOR A SECOND CAUSE OF ACTION
### *Discrimination in Violation of Title VII*
### *(Termination)*

85.     Plaintiff repeats and re-alleges each allegation contained in paragraphs 1 through 78, as if fully set forth herein.

86.     Defendant terminated Plaintiff because she did not acquiesce with or approve of, and in fact, objected to Robert West's discriminatory conduct in violation of Title VII.

87.     As a direct and proximate result of said acts, Plaintiff has suffered and continues to suffer damages, including, but not limited to, lost salary and benefits and interest thereon, pain and suffering, humiliation, mental anguish, emotional distress and loss of enjoyment of life.

## AS AND FOR A THIRD CAUSE OF ACTION
### *Retaliation in Violation of Title VII*

88.     Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 78 as if fully set forth herein.

89.     Defendant's failure to thoroughly investigate Plaintiff's harassment and discrimination complaints, adverse reaction to Plaintiff's EEOC filing, negative performance reviews and multiple demotions in title and job responsibilities, transfer to other departments, including a department with a known "playboy" she had specifically requested not to be placed with, transfer to the isolated satellite office in Fishkill, disciplinary actions for pretextual reasons, providing her with unattainable and false metrics she could not meet, accusations regarding her professionalism, and refusing to pay tuition for her daughter's undergraduate studies, were deliberate acts of

14

retaliation in response to Plaintiff's complaints and opposition to Robert West's unlawful discrimination under Title VII.

90.     By retaliating against Plaintiff for her good faith complaints and opposition to Robert West's unlawful discrimination, providing her with multiple negative performance reviews and multiple demotions in title and job responsibilities, transferring her to other departments, including a department with a known "playboy" she had specifically requested not to be placed with, transferring her to the satellite office in Fishkill, disciplining her for pretextual reasons, providing her with unattainable and false metrics she could not meet, accusing her of being unprofessional, and refusing to pay tuition for her daughter's undergraduate studies, Defendant Marist has violated the anti-retaliation provisions of Title VII.

91.     As a direct and proximate result of said acts, Plaintiff has suffered and continues to suffer damages, including, but not limited to, pain and suffering, humiliation, mental anguish, emotional distress and loss of enjoyment of life.

## VI.   **PRAYER FOR RELIEF**

### **ON ALL CLAIMS**

**WHEREFORE**, plaintiff respectfully requests that the Court:

1.      Declare Defendant's conduct complained of herein to be a violation of Plaintiff's rights under Title VII.

2.      Award Plaintiff the following:

3.      Damages for lost wages, salary, employment benefits and other compensation denied or lost to Ms. Decker by reason of the violation, tuition reimbursement for herself and her daughter, and compensatory damages for pain and suffering, humiliation, mental anguish, emotional distress,

and loss of enjoyment of life sustained by plaintiff, in an amount to be determined at trial, and reinstatement.

4.      Interest on the amount described above calculated at the prevailing rate; and,

5.      Punitive damages to be determined at trial;

6.      Attorneys' fees and reasonable costs incurred in prosecuting this action.

## VII.  JURY DEMAND

Plaintiff demands a trial by jury with respect to all issues and claims properly before a jury.

Dated:  White Plains, New York                Yours, etc.
        May 18, 2011

                                              **SAPIR & FRUMKIN LLP**

                                              By: _Elizabeth E. Hunter_
                                                  William D. Frumkin (WF 2173)
                                                  Elizabeth E. Hunter (EH 8061)
                                                  *Attorneys for Plaintiff*
                                                  399 Knollwood Road, Suite 310
                                                  White Plains, New York 10603
                                                  (914) 328-0366

F:\APPLICAT\WP\Decker\Federal Complaint.w fed claims.wpd\rfh

16